IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MEE O. SANDERS,

                                   Plaintiff,                     Case No. 3:04 CV 7751

      -vs-

                                                    <u>MEMORANDUM   OPINION</u>

UNITED AUTOMOBILE, AEROSPACE,
ADGICULTURAL IMPLEMENT
WORKERS OF AMERICA, LOCAL 12,
REGION 2B, et al.,

                                   Defendant.

KATZ, J.

This matter is before the Court on three motions for summary judgment filed by the various parties (Doc. 59, 62, 67) and various memoranda in support and opposition.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. Background[1]

### A. Lott and Sanders' job placement

DaimlerChrysler hired Mee O. Sanders ("Sanders" or "Plaintiff") as a temporary employee in March, 1996.  Sanders obtained full time status and accrued seniority with the Jeep Unit of Defendant United Automobile, Aerospace, Agricultural Implement Workers of America, Local 12, Region 2B ("Union") on May 1, 1997.[2]

---

[1] Many of the facts in this case are similar to those in *Sanders v. DaimlerChrysler*, Case No. 3:05-CV-7056, another case before this Court.  Discovery in these two related cases was consolidated.

[2] Sanders sustained an injury to her left shoulder while working in the Body Shop on May 23, 2002 and became subject to certain medical restrictions, although she did not miss work at that time.

(continued...)

Sanders began dating Defendant Richard Lott ("Lott"), another hourly bargaining unit employee of DaimlerChrysler, in January, 2001.  Lott would later become one of the three union stewards elected to represent the employees of the Assembly Department at DaimlerChrysler's Toledo North Assembly Plant ("TNAP").  Sanders was separated from her husband, and Lott had told Sanders he was planning a divorce from his wife, although it did not materialize.  In November, 2002, Sanders met Sidney Moore, an employee at another DaimlerChrysler plant.  By March, 2003, she was in a relationship with Moore, although there was still some sort of relationship between Sanders and Lott that Sanders sought to end.  Sanders Depo. at 115.  Sanders testified that after she told Lott that she did not wish to continue their relationship, "he kept holding my job over my head saying that, well, you know, I can do something to your job," and "he [said] that as long as I do what he wants me to do that he'd work on getting me back to work," in addition to other harassing and threatening calls and comments.  *Id.* at 112-14, 116.  She also alleges that Lott became verbally and physically abusive toward her and at times forced himself on her.

In March, 2003, less than two weeks after ending her relationship with Lott, Sanders was called to the Labor Relations Department.  Sanders alleges that, with Lott present, Labor representative Ed Schaffer told her that there was no work available for her.  She cried and told Schaffer about her financial problems, and Schaffer turned to Lott and asked, "Are you sure you want me to do this?"  Lott said he did.  Sanders alleges that when she then asked for her Union steward, Lott told her that he was her union steward, and no other Union official came.     Another

---

[2](...continued)
Sanders took an inverse layoff  from October 18, 2002 through November 4, 2002 and when she returned, the plant physician imposed a restriction that prohibited Sanders from using her left upper extremity at all while working.

employee, Melody Williams, later testified that after this incident, Lott said to Williams, "it's over, that's done, she's out of here, I guarantee she won't be back" and "trust me, she ain't coming back," referring to Sanders.  Def. Ex. 3, Testimony of Melody Williams Before Lucas County Common Pleas Court, July 20, 2005.  Sanders later learned that the job she had expected to be placed on had been assigned to another PQX employee from the Assembly Department who had less seniority than Sanders, but who was approved for the job by a physician who never tested Sanders for the job.

Sanders attended two meetings about the March, 2003 job loss.  Despite her request for union representation at those meetings, neither Dan Henneman (another Union steward) nor the other union official charged with representation, Chuck Huddleston, appeared at either meeting.  Sanders spoke with Bill Hall, the union-appointed first shift safety, about her position, and he referred her to Nick Vuich, another union member.  Vuich allegedly told Sanders he was aware of Lott's "womanizing" ways and asked if she could get back together with Lott.  After Vuich advised Sanders not to file a grievance and that he would look into it, Sanders claims to have called numerous times without resolution.  She testified that she later learned that Lott told Vuich to stay out of it.  Sanders Depo. at 321-28, 707-19.

Sanders further reported to Danny Twist, the international Union's servicing representative, who agreed to call Darrell Peterson.  Twist stopped taking her calls after she called numerous times to follow up.  She was then relayed a message from Twist at a Union meeting by Chief Steward Fred Muir that she opened up a can of worms and should have kept her mouth shut.  Sanders Depo. at 741-47.

Sanders also complained to other union members and officials that the job was given to someone with less seniority because Sanders refused to engage in activity with Lott, including: Brian Gray, the PQX facilitator on Sanders' shift; Fred Pettaway, a second shift Union official; Employee Assistance Program ("EAP") representative Lee Herbert; Huddleston; Ken Smith, from the Union's community action program; and Union steward Patty Hudak.  They generally avoided her.  In the case of Lee Herbert, who spoke to Sanders in the Union committee room in the presence of Chief Steward Muir, Herbert commented that women had trouble with relationships gone bad and they were put out of work or on hard jobs.  He compared the situation to his own, as he was dating a Union member for whom he was trying to arrange a forklift certification.  Sanders Depo. at 753-61.  At one point, Sanders complained to Henneman that Lott beat and tried to rape her.  Henneman merely observed that she and Lott seemed happy together, and he did not seek a statement from Lott.  Henneman Depo. at 34-35; Lott Depo. at 20.  Hudak, a female steward, later testified that "it's like the code . . . union members don't file grievances against union members. We turn them over to our chairman and let them handle it. . . ."  Hudak Depo. at 22-28.

From April to October, 2003, Sanders alleges that Lott stalked her and lured her into sexual activity with promises that if she engaged in activity with him, he would have her returned to work.  She ended all contact with Lott in October, 2003, when she alleges he forced himself on her in her home.  Sanders Depo. at 248-49, 853-54, 860-66; Moore Depo. at 55-56.

**B. Sanders' return to work**

In March, 2004, the Union and DaimlerChrysler's Labor Relations Department agreed to return Sanders to a position where she would not be working near Lott.  Second shift Union committeeman Bill McCullough told Sanders to report to TNAP in March, 2004 to find a job she

4

could do.  She was given a copy of a Notice of Return to Work, which reflected a temporary transfer from the Body Shop to the Assembly Department, approved by Mike Toney, the Area Manager for the Body Shop.  Sanders then reported to the engine line and submitted the Notice of Return to Work to the line advisor, John Zapf.  Nick Weber, a Labor Relations representative, and Gray approved the job to start on March 22, 2004.  Her return to work, however, was delayed.

  The Area Manager of the Assembly Department, Torrence Frazier, testified that he received several calls at the beginning of the shift from PQX employees, or employees with medical restrictions, from the Assembly Department who were complaining that an employee from the Body Shop was being placed on jobs before they were placed, in violation of the placement procedure in the collective bargaining agreement.  Later, Frazier received a call from Zapf, who told him that Sanders had reported to the Assembly Department and asked to be placed on an available job, but Frazier told Zapf to send Sanders back to the PQX Coordinator.   Frazier then called the PQX Coordinator and confirmed that there were PQX employees from the Assembly Department who had not yet been placed.  Sanders testified that Frazier responded "Oh, hell no," upon hearing of Sanders' potential placement on the engine line.  Sanders Depo. at 365.  Sanders approached Frazier and showed him her return to work papers.  She claims that he said "oh, how nice," and threw the papers in her face.  She threatened to file a grievance, and Frazier declared, "that's not going to get you anywhere."  Sanders testified that she later learned that, at that time, Lott was searching for Frazier.  Sanders Depo. at 348-50, 356-68, 373.

  Sanders filed a grievance on March 22, 2004 as a result of not being permitted to return to work on the engine line in the Assembly Department, asserting that she should have been placed on a job according to her restrictions and seniority.  Henneman signed the grievance and asked

5

Toney whether there was any work available for Sanders in the Body Shop.  Henneman Depo. at 114-16.  Toney told Henneman there were no available jobs, and Henneman submitted the grievance to the chief steward for processing.  *Id.*

Weber wrote DaimlerChrysler's response to Sanders' grievance. The Company's response was:

> Relief requested for pay for the week of 3/22 through 3/26 denied. Grievant was informed by this writer (Nick Weber) of Labor Relations on Monday 3/22 that the Return to Work was void because the department KJ Assembly was over roll. On several occasions that week this writer informed the grievant that I was looking for work and that she was not being paid as she was not on the active roll. That notwithstanding, Area Manager Mike Toney and this writer reviewed the jobs in grievant's home department. As a low seniority floater, the grievant would not be able to perform jobs as required. Grievance denied. Labor Relations and PQX facilitators will continue to seek placement within grievant's restrictions.

Sanders Depo., Ex. O.

On July 14, 2004, Sanders filed a charge of discrimination with the Ohio Civil Rights Commission alleging sex discrimination based upon the denial of a place for her in the Assembly Department in March, 2004.  In her charge Sanders accused Lott of taking actions to prevent her from returning to work because she would not reunite with him.  Sanders alleged that Frazier made the decision that Sanders could not be placed in the Assembly Department, and further alleged that Frazier and Lott were friends.  Sanders amended the charge in August 2004 to include a charge of retaliation.  The Equal Employment Opportunity Commission issued a right to sue letter on September 9, 2004.

### C. Incidents on production line

Sanders was returned to work on October 5, 2004.  She worked from then through April, 2005 without incident, in the position for which she had been approved in March, 2004.

6

### 1. May 10, 2005 "lunging" incident

On May 10, 2005, Lott was rotated to the area in which Sanders was working.  Lott testified that he was aware that he would be representing employees in the area where Sanders worked, so he informally sought advice from a group of management and union officials who were gathered in the Labor Relations Department about how he should deal with Sanders in light of the fact that Sanders had filed a charge of discrimination accusing him of preventing her from returning to work.  Lott was advised to treat Sanders the same way he would treat any other co-worker.  Hathaway Depo. at 52, 53, 55; Lott Depo. at 14.

As part of his duties as a union steward, Lott walked down the production lines and greeted each of the workers and checked to see if anyone had a concern to bring to his attention.   On May 10, 2005, Lott and Sanders' supervisor, Aaron Drill, walked by Sanders to greet her.   Drill approached Sanders and asked her whether she was okay with Lott speaking to her; Sanders replied that she was not.  Drill Affidavit at ¶5.  Defendant Lott asserts that before Drill could instruct Lott not to speak to Sanders, Lott walked by, waved at Sanders, and said, "Hi, Mee."  Drill Affidavit at ¶6.  Sanders describes the event differently; according to Sanders, Lott walked up behind her and surprised her by "lunging" at her, waving his right arm at her in a threatening manner and "yelling" "Hi, Mee." Sanders Depo. at 505.  Lott was near her for about 15 seconds.  Sanders Depo. at 504.

Sanders reiterated to Drill that she did not want Lott to speak to her, and Drill told Sanders that Lott had been advised to treat Sanders the way he treated all other employees.  Drill Affidavit at ¶7; Sanders Depo. at 507, 514.  Sanders requested that Drill arrange a meeting with Labor Relations and the Union.  Sanders then used her cellular telephone to call the Union committee

7

room, the Labor Relations Department, a representative at the EEOC, a representative at the

National Labor Relations Board, a Toledo Police officer with whom she was acquainted, her

attorney, the Union's Jeep Unit secretary-treasurer Mark Epley, and the security department at

DaimlerChrysler.  Sanders Depo. at 510-512.  Drill told Lott that Sanders did not want him to

speak to her and Lott agreed that he would not speak to Sanders again.  Drill Affidavit at ¶9.

After Sanders called the Labor Relations Department, Labor Relations representative Tracy

Relue arranged a meeting with Sanders, Drill, Epley, and Hudak (the female Union steward) in the

Labor Relations Department.  Sanders explained that she understood when she returned to work in

October, 2004 that Lott would not be permitted to speak to her and that by allowing Lott to speak

to her, DaimlerChrysler had created a hostile work environment.  Sanders stated that she did not

have a problem with Lott being in her work area so long as he did not speak to her.  After the

meeting, Sanders returned to her job and worked the balance of her shift without incident.

### 2. The July 25, 2005 incident

In July, 2005, Sanders sought a civil protection order ("CPO") against Lott before the

Lucas County Court of Common Pleas.  Sanders was granted a temporary CPO, and a hearing was

scheduled on a permanent CPO.  At the July 20, 2005 CPO hearing, Sanders was alone on the

plaintiff's side of the courtroom, with the Union, Lott, and DaimlerChrylser on the defendant's

side.  Sanders testified at that hearing that Lott engaged in forceful physical contact against her on

more than 40 occasions between the summer of 2002 and fall of 2003, and that he called her and

threatened her on a daily basis until September, 2004.  Sanders' daughter testified that she

witnessed Lott fighting with her mother.  CPO Transcript, Pl.'s Ex. 3 at 16-21, 82-83.  Although a

8

permanent injunction was denied, the court did warn the defendants to keep Lott away from Sanders, at least in the interest of prudence.

On July 25, 2005, the first shift Sanders worked after the CPO hearing against Lott before the Lucas County Court of Common Pleas, one of Sanders' co-workers, Helen Pawlicki, summoned Lott to her work area. Sanders Depo. at 559, 598. Pawlicki, who was working about two feet away from Sanders, talked to Lott for about two to three minutes. Lott did not speak to Sanders, but Sanders alleges that she feared for her safety because Lott had been standing so close to her. Sanders Depo. at 563, 571. When Lott walked away, Sanders, who had been talking to a friend on her cellular telephone, ended the call with her friend and immediately called 911 and asked the Toledo Police to send a crew to TNAP. A police crew responded and took a statement from Sanders. Weber also took a statement from Sanders in the presence of Henneman, Epley, a TNAP security officer, and the Toledo Police officers. Sanders was released from duty for the rest of her shift, and she called a friend to drive her home because she was too upset to drive.

Weber investigated the events of that evening by interviewing several employees who had been working in the area when Lott was talking to Pawlicki. Hudak Depo. at 45-53. At a later interview, Pawlicki said that Lott had not even been within arms' reach of Sanders on July 25, 2005. Weber Affidavit.

When Sanders reported to work the following day, Weber and Epley told her to take the day off and that she would meet with TNAP's local response team the next day. Sanders Depo. at 595-600. After a dramatic meeting, which was interrupted after an emotional breakdown by Plaintiff, DaimlerChrysler decided to transfer Sanders to the Paint Department, where she would not have any contact with Lott. Henneman Depo. at 26; Sanders Depo. at 610-611. Sanders filed

a grievance to protest being transferred to the Paint Department on August 1, 2005.  Sanders Depo.
at 548, 651-652.

## II. Summary judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the
district court of the basis for its motion, and identifying those portions of 'the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'
which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the
absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at
323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts
showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250
(1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment
cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply
[to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving
party to go beyond the pleadings" and present some type of evidentiary material in support of its
position.  *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802
(6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing

10

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams    v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Discussion

Sanders has alleged five counts against the defendants: 1) a claim of assault against Lott, 2) gender discrimination and sexual harassment against the Union and Lott[3], 3) breach by the Union of its duty of fair representation, 4) retaliation by the Union in violation of federal and state law, and 5) ratification by the Union of Lott's allegedly unlawful acts.  Pl.'s Amended Complaint, Doc.

---

[3]

 Lott briefs only the assault claims, but moves for summary judgment "as to any and all claims against him. . . ." Def. Lott's Mo., Doc. 60 at 10.  As such, this Court will address both the assault and harassment/discrimination charges against Lott.

26.  Defendant Union has moved for summary judgment on counts two, three, four, and five.  Doc. 68.  Defendant Lott has moved for summary judgment on count one.  Doc. 60.  Plaintiff Sanders has moved for summary judgment against Defendant Union on counts two, three, and four.  Doc. 62.

Some of Plaintiff's claims against the Union are legally intertwined.  Plaintiff Sanders alleges that the Union breached its duty of fair representation by means of sexual harassment and discrimination based on gender.  She further alleges breach by the Union's alleged failure to investigate and present her grievances against Lott and other Union members for sexual harassment and preventing her from returning to work.

**A. Duty of fair representation**

A union has a statutory duty to fairly represent all employees in the bargaining unit.  *Ford Motor Co. v. Huffman*, 345 U.S. 330 (1953).  A breach occurs when a union's conduct toward a member is arbitrary, discriminatory, or in bad faith.  *Vaca v. Sipes*, 386 U.S. 171 (1967); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344 (6th Cir.1989); *see also Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir.1994) (A union breaches the duty in the processing of a grievance if it acts by discrimination, in bad faith, or with extreme arbitrariness.).  If the union has the sole power to invoke the higher stages of the grievances procedure, and the employee has been prevented from exhausting her contractual remedies by the union's wrongful refusal to process her grievance, the employee may bring a cause of action for breach of the duty of fair representation.  A union may not ignore a meritorious grievance or process it only perfunctorily.  *Id.* at 190-91.  Although its processing need not be flawless, a union must undertake a reasonable investigation of grievances.  *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976); *Black*, supra.  The failure

12

to investigate a grievance at all may constitute a breach of the duty where the union does not process the grievance and the union lacks a factual basis that leads it reasonably to conclude that the grievance is without merit. *Schoonover v. Consolidated Freightways Corp.*, 147 F.3d 492 (6th Cir. 1998); *Service Employees, Local 579 (Beverly Manor Convalescent Center)*, 229 N.L.R.B. 692 (1977); *Newport News Shipbuilding and Dry Dock Co. v. N.L.R.B.*, 631 F.2d 263, 269 (4th Cir. 1980). When the discrimination is solely alleged to be the result of the union's actions, the union's is the conduct at issue and the employer need not be made a party in the case, and breach of contract need not be made a claim. *Breininger v. Sheet Metal Workers In'l Ass'n Local Union No. 6*, 493 U.S. 67 (1989).

Plaintiff frames her claims of discrimination and retaliation in terms of sexual harassment, and this Court will address them as such. Both arise under Title VII and Ohio law. Discrimination actions brought under state law are to be analyzed using the Title VII approach used under federal law. *See* Ohio Rev. Code § 4112; *Joint Apprenticeship Committee v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981). *See also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981); *Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St.3d 607, 609-10, 575 N.E.2d 1164 (1991).

In Ohio, an individual employee may be liable for sexual harassment under state law, but not Title VII. Ohio Rev. Code § 4112; *Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293 (1999); *Cheek v. Indus. Power Coatings, Inc.*, 84 Ohio St.3d 534 (1999). In *Genaro*, the Ohio Supreme Court noted that

> R.C. 4112.02 provides that "[i]t shall be an unlawful discriminatory practice: (A) [f]or any employer, because of the race, color, religion, sex, national origin,

13

handicap, age, or ancestry of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.01(A)(2) defines "employer" as "any person employing four or more persons within the state, and *any person acting directly or indirectly in the interest of an employer*." (Emphasis added.) Further, the term "person" is defined very broadly by R.C. 4112.01(A)(1) as including "one or more individuals, * * * any owner, lessor, assignor, * * * agent, [and] employee." It is clear that the R.C. 4112.01(A)(2) definition of "employer," by its very terms, encompasses individual supervisors and managers whose conduct violates the provisions of R.C. Chapter 4112.

Moreover, R.C. 4112.08 mandates that "[t]his chapter [4112] shall be construed liberally for the accomplishment of its purposes * * *."

*Genaro*, 84 Ohio St.3d at 296.  *See also Cheek*, 84 Ohio St.3d at 534 (holding that "an individual employee, not otherwise deemed to be an 'employer' under the statute, may be individually liable for alleged violations of the employment discrimination provisions of the Ohio Civil Rights Act, Ohio Rev. Code §§ 4112.01(A)(2), 4112.02(A) & 4112.99").

A union's breach of the duty of fair representation can be established by evidence showing hostility to the employee, including forms of discrimination or bias.  The duty of fair representation includes the duty not to discriminate on the basis of sex.  *See N.L.R.B. v. Local 106, Glass Bottle Blowers*, 520 F.2d 693 (6th Cir. 1975).  "In fact, it is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII if the breach can be shown to be because of the complainant's race, color, religion, sex, or national origin."  *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1104 (6th Cir. 1981); *see also Dolittle v. Fuffo*, 1990 WL 2648 at *3 (N.D.N.Y. 1990)("Labor unions are subject to the dictates of Title VII."); *Wilson v. American Postal Workers Union*, 433 F.Supp.2d 444, 448-49 (D.Del. 2006).  Sexual harassment in the union context constitutes discrimination under Title VII, which makes it discriminatory conduct in violation of the union's duty of fair representation.

14

Courts recognize two types of sexual harassment claims: (1) harassment that creates an offensive or hostile work environment, and (2) quid pro quo harassment, whereby a supervisor demands sexual favors as a condition for job benefits. *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178 (6th Cir. 1992), *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618 (6th Cir. 1986), *Yates v. Avco Corp.*, 819 F.2d 630, 634 (6th Cir. 1987).  While, as the Supreme Court has instructed, "the labels quid pro quo and hostile work environment are not controlling for purposes of establishing employer liability," they are still relevant to the "threshold question [of] whether a plaintiff can prove discrimination in violation of Title VII." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753, 765 (1998).

### 1. Hostile work environment

To prove a claim of hostile work environment harassment, a plaintiff-employee must show that:

> 1) the employee was a member of a protected class; 2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; 3) the harassment complained of was based upon sex; 4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the [psychological] well-being of the plaintiff; and 5) the existence of respondeat superior liability.

*Kauffman*, 970 F.2d at 183.

"A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000) (citations omitted). In order to find a hostile work environment, "[b]oth an objective and a subjective test must be met: the conduct must

15

be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.*

> The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. *See Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case." *Id.* The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility. *See id.* at 563. Isolated incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

*Id.*  To establish respondeat superior liability for sexual discrimination based on co-worker harassment, it must be established "that the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  *Kauffman*, 970 F.2d at 183 (citing *Rabidue*, 805 F.2d at 621).  In the case of harassment by a supervisor, "the determination of [employer liability] for its supervisor's actions depends on 1) whether [the supervisor's] harassing actions were foreseeable or fell within his scope of employment and 2) even if they were, whether [the employer] responded adequately and effectively to negate liability."  *Kaufman*, 970 F.2d at 184.

Plaintiff has established the elements of hostile work environment harassment.  1) She is a woman, a member of a protected class.  2) She was subjected to unwelcome sexual advances from her union steward, Lott, over a long period of time that saw her on and off of work while their relationship regressed from dating to abuse.  3) The harassment would not have occurred but for

16

Sanders' gender, as demonstrated both by the nature of the relationship and by statements such as those made by Herbert during a meeting with Sanders and Chief Steward Muir, that women had a hard time dealing with relationships at the plant and losing their jobs.  Sanders was also asked, upon complaining to the Union's community action program, if she could get back together with Lott, implicitly to remedy her work situation – a repugnant notion.

4) Plaintiff has also shown that the harassment affected her well-being, both in terms of her physical treatment by Lott and the mental-emotional damage that accompanied the harassment, threats, and apparent futility in pursuing her grievances or finding work.  That emotional damage was evidenced by Sanders' emotional breakdown at the July, 2005 meeting, in the intimidating presence of Union and company officials after years of harassment and recent intimidating acts by Lott.  5) Finally, respondeat superior liability is clear because the Union had actual knowledge of the situation between Lott and Sanders by virtue of the long and tortured history of grievances and drama, yet Lott was advised to interact with Sanders on a normal basis and was even escorted to her work station by her supervisor Drill as late as May, 2005.

The Union's defense of this situation relates to isolated incidents that it argues did not constitute a hostile work environment for Sanders.  This Court views the totality of the circumstances and considers a claim of sexual harassment not necessarily to be a result of a particular incident or even particular isolated incidents alone, but rather as a developing situation that results from, in this case, harassment by a co-worker and fellow Union member without adequate protection (and even with support) from supervisors and Union officials who threatened, manipulated job placements, and displayed a reluctance to help, resulting in a hostile work environment.

17

### 2. Quid Pro Quo Harassment

In order to establish a claim for quid pro quo sexual harassment, a plaintiff-employee must prove:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

*Kauffman*, supra at 186.

Sanders has established the existence of quid pro quo harassment.  Factors 1, 3, and 5 are parallel to factors 1, 3, and 5 described above with regard to hostile work environment harassment. 2) There are numerous instances, as described above, of Sanders informing Union members and officials of Lott's unwelcome sexual advances, including the string of abuse and threats by Lott between April and October, 2003.  In fact, neither defendant adequately refutes the accusations of sexual violence by Lott as alleged by Sanders.

4) Neither does either party really contest that Lott requested sexual favors in exchange for influencing her job placement, or that Frazier, a supervisor and friend of Lott's, went conspicuously out of his way to remove Sanders from eligibility for work upon her return to TNAP in March, 2004.  The Union claims that Sanders had a "veritable army of Union officers and stewards . . . and Labor Relations employees" working on her complaints against Lott, but none of them was able to place her in the PQX position because she did not have seniority over others in those positions.  Doc. 68 at 15.  The Union, however, fails to explain how having the "veritable army" of Union officials and employees, despite even bending the rules to secure favorable

18

treatment for Sanders, failed to place her in a line position for which she had already been approved sooner than at least six months after the approval (March to October, 2004).  When Sanders arrived for work on March 22, 2004, several Union officials "expressed disbelief" at Frazier's sending her back to the PQX office, but the Union settled the grievance Sanders filed (as a result of her filing with the OCRC) as no contract violation, persisting in the argument that no work was available.  Def. Union's Memo. in Support of Summary Judgment, Doc. 68 at 6.  Such situation alone, even if true, would not justify the totality of the discriminatory actions implicated in this case and described herein.  As such, Plaintiff has sufficiently established the elements of sexual harassment, and, by extension, breach of the Union's duty of fair representation.

### C. Assault

Defendant Lott has moved for summary judgment on Plaintiff's assault claim.  In Ohio, assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Watkins v. Millennium School*, 290 F.Supp.2d 890, 896 (S.D. Ohio 2003).  "The threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching." *Id.*, citing *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 406 (Ohio Ct. App. 1993).  Physical injury need not be proven.  Basically, "an assault is the beginning of an act which, if consummated, would constitute battery." 6 Ohio Jur. 3d Assault–Civil Aspects § 2 (2007).  "Stated differently, an assault is an act done toward the commission of a battery, immediately preceding the battery, when the next movement would, at least to all appearance, complete the battery." *Id.*

Plaintiff claims two instances of assault against Lott: the May 10, 2005 lunging incident, and the July 25, 2005 incident.  As previously noted, because the movant with regard to this claim

19

is the defendant, the Court must consider the facts as presented by the non-movant plaintiff to be applied for the purposes of this analysis.

With regard to the May 10, 2005 incident, Plaintiff claims that Lott jumped toward her and raised his right hand in the air, bringing it down at her in a hitting motion, but stopping short of making contact with her, yelling "Hi, Mee!"  Defendant Lott claims that he simply walked up to her and said, "Hi Mee."  There is a genuine issue of material fact which this Court cannot resolve on the pleadings currently before it.  That issue alone would preclude a grant of summary judgment.  Taking the facts as pled by Plaintiff, the elements of assault may reasonably be found by a jury to have been met.  Lott would have known, in that scenario, that his sudden lunge and gesticulation would produce fear in Sanders of an imminent battery.  This is especially true when considered in light of the dramatic physical and intense emotional history between these individuals.  Lott's action was willful, and the threat of harm reasonably placed Sanders in fear of harmful contact.  Sanders' fear, as demonstrated by her reaction to the incident as described above, was real.  Summary judgment cannot be granted.

With regard to the July 25, 2005 incident, Plaintiff admits that Lott did not talk to her, but only that he stood near her while speaking to another employee on her line, as was his job. Plaintiff notes, however, that Lott's presence was intimidating because the incident occurred on her first shift back to work after the CPO hearing in Common Pleas Court at which the judge denied a permanent CPO, but warned the defendants to keep Lott away from Sanders.  That hearing saw fearful, often tearful, testimony from Sanders and her daughter.

In comparison to the May lunging incident, the July incident was clearly more passive in nature.  There was no direct contact between the parties.  There is, however, something to be said

for the timing of the incident.  It was done in contravention of an unofficial request from a judge during a CPO hearing, directly after such hearing.  Lott would have known that his presence so close to Sanders at that time and under all the circumstances of their relationship would have amounted to a threat of harm.  Likewise, Plaintiff would have readily and reasonably harbored fear of such a threat simply by Lott's presence as proximate as it was to her.  All these factors considered together, however, cannot constitute a physical act, the consummation of which would have created harmful or offensive contact.  It may have been reasonably intimidating and frightful, as well as imprudent and insensitive, but it was not assault.  Defendant Lott's motion for summary judgement shall be granted with regard to the July 25, 2005 incident, but denied with regard to the May 10, 2005 incident.

**IV. Conclusion**

For the reasons described herein, Defendant Lott's motion for summary judgment is granted in part, and denied in part.  (Doc. 59.)  Plaintiff Sanders' motion for partial summary judgment with regard to discrimination and breach of the Union's duty of fair representation is hereby granted.  (Doc. 62.)  Defendant Union's motion for summary judgment is hereby denied. (Doc. 67).  Plaintiff's motion to strike denied as moot. (Doc. No. 92).

IT IS SO ORDERED.

s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE